PARKS
*vs*
RICHARDSON *et al*

COVENANT.

Case 55.

Sept. 23.

Where a party
fails to take
proof in a mat-
ter which in-
volves his char-
acter, it authori-
zes the presump-
tion that it can-
not be done.

## Parks *vs* Richardson *et al.*

ERROR TO THE LOUISVILLE CHANCERY COURT.

*Presumptions.   Evidence.*

CHIEF JUSTICE EWING delivered the opinion of the Court.

UPON a careful examination of the evidence in this re-
cord, we are pretty well satisfied that the slave in contest
is the slave of Nevels, that he ran away from him, and is
subject to the complainant, Jones', demand. Though
the evidence of McLean is awkwardly given, it clearly
imports an intention to identify the slave, and an awk-
ward effort to manifest by expression that intention, and
if false would as certainly subject him to a prosecution
for perjury as if he had expressed it in unequivocal terms.
And if the slave's recognition by McLean, as his old
overseer, was brought about by contrivance between him
and the two witnesses who prove it, or by them and others,
they all would be as much exposed to a prosecution for
perjury and subornation of perjury as if they had sworn
directly and positively false. If the object had been to

identify the slave by false swearing, it most likely would have been done by positive and direct swearing. We think, therefore, that the apparent omission to answer directly, may be ascribed to ignorance rather than an attempt at evasion. The statement of McLean as to the time the slave escaped, ought not to invalidate his evidence. This should rather be ascribed to mistake or mis. recollection than to falsehood. The mistake in this particular, shows that there was no concert or combination. It is clear that the slave was a runaway; that he was placed in the work house as such, and that a short time after he escaped from the work house, he is found in possession of Parks and he has failed to show that he has any title to him. If even the bill of sale which he exhibits is genuine, he has not shown or attempted to show, that Mrs. Wilkinson and her son had any title to the slave, nor that there was any such person in being; and it is passing strange, when his title was involved and circumstances proven which reflected so much infamy upon his character, in relation to his pretended derivation of title, that he had not taken the deposition of some one in Natchez, (where the bill of sale represents Mrs. Wilkinson as living,) to prove her title, or if that could not be traced, to prove at least, that such a person existed. The bare omission to do so, strongly demonstrates that the pretended bill of sale produced was a contrivance ' concocted by Parks, probably in concert at the time with Carroll, to cover over the fraud and secure Parks from responsibility. The consideration, with interest, was the true criterion of recovery. Parks having no title to the slave at the time of sale, he should refund what he received, with interest. Having no title, he had no right to the service of the slave, and has, therefore, no right to off-sett the value of the services against the interest. Richardson may be yet made responsible to the true owner for the services.

Decree affirmed with costs, &c.

*Pirtle and H. Marshall* for plaintiff: *Guthrie, Pilcher and Clark* for defendants.

October 9.                    PETITION FOR A RE-HEARING,

By Messrs. H. Marshall and Pirtle.

THE counsel for Edward Parks, have examined the opinion rendered by the Court of Appeals in this case, and they feel bound by their sense of the injustice which it operates upon their client, respectfully, yet most earnestly to ask the Court to grant a re-hearing of the cause.

The counsel are not at all disposed to hypercriticism, yet they indulge the hope that if this Court is only "pretty well satisfied that the slave in contest is the slave of Nevels," the door may not be yet utterly closed, but that still the Court would listen to arguments which might tend to produce that certainty of conclusion upon which judicial decrees should always rest.

The Court of Appeals has not given, in their opinion, any statement of the pleadings or the testimony, yet we are enabled to perceive, from the course of the opinion, *that the main branch of the defence in this case has not been touched upon, if considered,* and we respectfully invite the attention of the Court to it.

In order more readily to comprehend the exact point at which we aim, permit us briefly to recapitulate the nature of this case, as it is presented by the pleadings.

Lafayette Jones filed the original bill and made William Nevels and Samuel Richardson defendants thereto. He alledges that Nevels is a non-resident; was a planter in Louisiana, and his debtor to an amount exceeding $300; was the owner of divers slaves; became embarrassed; killed a man and ranaway to Texas; that some of his slaves absconded from his plantation, and that one of these was, at the time of filing the bill, in the possession of the defendant, Richardson, who claimed to own him. He exhibits Nevels' notes for the debt claimed, and prays to subject the slave to the payment of the same. The traverse directed by statute is Nevels' answer. Richardson answers the bill and denies every material allegation thereof, and requires full proof. Richardson makes his

answer a cross bill against Edward Parks, and (contrary to rule, authority or precedent,) in his cross bill reiterates against Parks all the allegations of Jones' bill, which, in *his* answer, *he* had denied. In the first place he exhibits, as his title to the slave, a bill of sale dated 28th December, 1837, which purports to be signed by "Edward Parks by Stephen Chenowith, his agent." He alledges that at the time of the sale to him by Parks, the latter had no title to the slave; that the slave was a runaway and belonged to Nevels, and the sale was fraudulent and the ownership claimed by Parks fraudulent, and he prays for a *ne exeat* against Parks and an attachment against *his* property, and that on hearing, (should Jones succeed,) the Chancellor would sell the attached property to reimburse him his money, ($700,) with interest, as also the expenses of keeping the negro, *pendente lite*, in the jail.

Parks, by his answer to the cross bill of Richardson, asserts the following propositions:

1st. He denies peremptorily Chenowith's agency, and denies that he ever sold the negro in question to Richardson, or ever received one cent of the $700, said to have been paid for the boy by Richardson.

2d. He admits that he formerly claimed ownership over the slave now in Richardson's possession, but denies that the boy ever belonged to Nevels; he says, while he was the owner of the slave, on account of gross misconduct, he carried the slave, bound hand and foot, to the jail, of which Chenowith was keeper, and there depositing him with Chenowith, who was trading, at the time, to the south, in negroes, authorized Chenowith to sell him to some one down the river. Before Chenowith made any effort to dispose of the boy, he exchanged for him, with Parks, a negro girl, between whom and the boy, he agreed to give Parks the difference of $150. The exchange was made—Parks took Chenowith's girl home and the boy remained in the jail, thenceforward Chenowith's property. After this Chenowith sold the boy to Richardson, and in bad faith and without authority, pretended to be selling the boy by virtue of an agency, as the property of Parks. Parks denies the deed, and that he is in any

way bound by it, or bound to respond to Mr. Richardson in regard to the title; because, if the bill of sale, with warranty, is not, in fact, his deed, the privity of contract doth not exist, and Richardson should look to Chenowith, his vendor.

3d. Though Parks presents the foregoing considerations in bar of any claim Richardson may have upon him, yet denying any authority forcing him to do so, he exhibits the title under which he held the slave.   This is a bill of sale purporting to be drawn by Mrs. Wilkinson of Natchez, signed by her "by H. J. D. Wilkinson," and conveying the negro boy to Parks for $650.   This bill of sale is attested by Thomas Carroll.   Parks alledges in his answer, that some two  years prior to the institution of this suit, Richardson, pretending to be alarmed about the title to this boy, had filed a bill praying a rescission of this same contract of sale, and alledging that the boy belonged to men, named Mitchell and Bailey; that in answer to that bill, he had then denied, peremptorily, Chenowith's agency, or that the bill of sale which Richardson held was his deed, and had thus put Richardson entirely upon his guard as to the *spuriousness of any claim upon him.*   He had then explained how Chenowith and he had exchanged negroes, and had then exhibited this same title, and then Richardson had quietly dismissed his bill, and had withdrawn from the Court, thus acknowledging that *he knew* he had traded with Chenowith and not with Parks.

4th. Parks denies the allegations on which the *ne exeat* and attachment are founded, all fraud, and asks to be relieved, &c.   Thus stand the pleadings.   The first point, both on the original and cross bill, to be proved, is the identification of the negro, who was held by Richardson *as a negro belonging to Nevels.*   To this point a single witness is introduced, Mr. McLean, a negro driver and overseer from Louisiana.   His deposition was taken on the original bill, on the 12th day of February, 1842; his deposition on the cross bill was taken on the 18th day of February, 1842.  Here was an interval of six days between the periods at which he deposed—ample time for reflection and for the correction of *"mistakes."*   As

Mr. McLean's testimony is short, and is the same exactly in both depositions—we will beg leave here to repeat it. He says he became acquainted with Nevels in 1830, and acted as overseer for him in 1837, on his plantation in Madison Parish, Louisiana ; that during that year Nevels worked some 25 or 30 hands.  "*Question* 5.  Did he or not own a slave by the name of *Tom* at that time, 1837? *Answer.*  He did own a slave, named Tom, in 1837. *Question* 6. Did or not said slave, Tom, runaway from Nevels while he was his slave, and if he did, *when was it said slave ranaway?  Answer.  In the latter part of the year* 1837, *the slave Tom, above alluded to, did runaway from the said Nevels,* and he has never since recovered him.  *Question* 7. Have you or not, ever seen the slave, Tom, since he ranaway from Nevels, and if you have, where was he, and did he know you before you spoke to him?  *Answer.*  He has seen the said slave, Tom, since he ranaway; within the past week deponent, with some others, went into the jail in this City, to see said slave. On going in, the slave, Tom, recognized deponent as being his old overseer and called him by name, without deponent's speaking to him at all; he was, however, asked the question by the deputy jailor, if he knew deponent, without mentioning deponent's name, and his reply was, that deponent was his old overseer, calling him by name at the same time."  To question 8 he responds by proving Nevels' signature to the notes exhibited with the bill of Jones, one of which is dated in 1838; and this is all the evidence on the part of complainant, touching the ownership by Nevels, or the identity of the slave.

The Court of Appeals allude to this evidence in these terms: "Though the evidence of McLean is awkwardly given, it clearly imports an intention to identify the slave, and an awkward effort to manifest, by expression, that intention; and if false, would as certainly subject him to a prosecution for perjury as if he had expressed it in unequivocal terms."  The counsel for Parks are at a loss to know whence the Court draw this conclusion; or that which follows, in which the Court ascribe the omission to answer directly, as to the identity of the negro, "to ignorance rather than an attempt at evasion."  When we

regard the fact that McLean had been brought from Louisiana to Louisville to act as witness; that he gave his testimony on two occasions, after an interval of six days for reflection; when we look at the queries propounded, and in most instances the direct and intelligible answers given to the question, without evasion or superfluous language, and then to the answer to the 7th interrogatory, we are at a loss to perceive how that answer can be ascribed to any other motive than an artful attempt to weave the acts and declarations of a slave into his testimony, upon a point at which his own knowledge stopped, and upon which he could not conscientiously speak! The interrogatorys of complainant shows that he ¡was aware McLean could not identify the boy, and complainant relied on procuring as evidence, the acts, &c. of the slave.

It is suggested by Judge Pirtle, that the Court cannot fail, by observing the fact that McLean came here from Louisiana to give testimony of identification; the manner in which the interrogatories of the complainant are put, to perceive immediately, that the complainant knew McLean could not identify the negro, and hence relied upon availing himself of the testimony of the negro. Why else does not McLean speak of his own knowledge? Why else are Jones and Kinney and the assistant Jailor, and McLean, all paraded into the jail to mark what passes at that interview? Sirs, they went *in order* to give testimony! They went, knowing full well that McLean could not recognize him, and determined to use his acts and declarations to patch out their miserable case. McLean does not say one word in the jail; he addresses no remark to his companions; he lets no word fall from him implying recognition; he holds no conversation with the boy; the boy only responds to the interrogatory of his Jailor; McLean does not say he recognizes *him;* the boy is prompted to what *he* said and did; the boy does not say McLean was his *old overseer at Nevels;* that he was "his old overseer" is no proof *of property in Nevels at the year* 1837, *or at the institution of this suit.* The complainant puts such interrogatories to this witness as prove beyond doubt, he knew beforehand, the extent and bearing of his answers, and of his knowledge, else why the question,

"did he know you before you spoke to him?" The complainant was aware of what had taken place at the jail, communicated to his counsel of course, by Jones, and yet no interrogatory, "is the boy in jail Nevels' property;" "do you know this boy belongs to Nevels?" There is nothing open—nothing plain. The speech is all evasion and it is a palpable attempt to circumvent the law, and by a sort of Waverly Novel tale, to make an impression upon the mind to which the rules of established law shall bend. The Court says, McLean made "*a mistake.*" McLean, a southern overseer; a hireling of one man in one year and of another at another season; keeping a tally of his services; depending on them for his livelihood; brought here to swear, and swearing twice to the year, the number of hands of Nevels; his location in 1837; his overseership that year, (1837,) and that year only; seeing the slave; attempting trick and trap to get his declarations into the evidence; having his mind bent upon this subject, his only business here; his escape from the Court before cross-examination. Under all these circumstances, we submit, it is going too far entirely for the Court, without any data in the record, to assume that his establishment of a date, proved false, is only a mistake, or a mistake at all, in order to give effect to the claim of Jones.

We propound this interrogatory: Are the acts or declarations of a slave, at any time, competent testimony in a matter disputed between white freemen? The law, our institutions, custom, and our profession respond in the negative. Strip McLean's deposition of the recitation of the acts and declarations of the negro, and how does it stand? Doth it identify this negro as the property of Nevels, or is it even "an awkward attempt to manifest an intention to do so by expression?" It would stand, "he has seen the slave, Tom, since he ranaway. He went into the jail of this City last week *to see him;* that is, he went to do a thing which the answer leaves us in doubt whether it was done or not. If he were indicted for perjury upon that statement, would the fact that the boy who was in the jail, was not Tom, the property of Nevels, be

PARKS
*vs*
RICHARDSON *et al*

sufficient to convict him? The counsel considers the answer too plain for repetition.

Permit us, however, to mark the testimony in regard to that interview in the jail. Mr. Jones and George W. Kinney and McLean went to the jail and requested to see the negro. Jones was the complainant, Kinney the friend and McLean the witness. George Winders, the assistant Jailor, showed them up and brought the negro from the cell in which he was confined. Kinney and Winders detail the proceedings. Both agree that the negro instantly recognized Mr. Jones. How? Jones was a stranger: but the explanation is given in Jones' bill. He says "he had been to Louisville before; and had seen the boy in the jail in the presence of Winders. Kinney was an old resident and he details the positions of the parties. Jones stood before McLean, and Jones was recognized. Jones then stepped aside and the light from the window shone full upon McLean's features. The boy gave no signs of recognition. The Jailor says to him "Dont you recognize that man?" And the imprisoned slave, who was the automaton in the hands of these keepers and hunters, did as he was bid, and declared his recognition of the subject presented to him. Our client was not present. This scene occurred in the gloomy recesses of a dungeon. The parties—the keeper of the keys, the claimant, the witness and the slave. The witness speaks not in the openness of truth, and declares his recognition of the boy, but drawing to his aid the acts necessary to produce the desired impression, details what the slave said and did under the foregoing circumstances, and this is denominated by the Court, "an awkward attempt to express," rather to be attributed "to ignorance than an attempt at evasion!!" The witness, it will be recollected, left the State before Parks' counsel had an opportunity to cross-examine him, and thus to test the extent of his knowledge. Under these circumstances, it would seem to us, his deposition, especially as he is the only witness to the fact of identity, should, before it is taken in preference to Richardson's answer and Parks' answer, both sworn to and both denying the boy to have been Nevels' property, be full, particular, and perfect in its responses

and details.  Such it is not, for the opinion denominates it "awkward and equivocal."  We respectfully invite a re-hearing upon this testimony, because we think, upon a full discussion of it in all its bearings, the Court will be induced to change the opinion delivered.

The Court say, "the statement of McLean, as to the time the slave escaped, ought not to invalidate his evidence.  This should rather be ascribed to mistake or mis-recollection than to falsehood."

The statement is twice made—"He escaped in the latter part of the year 1837."  The witness had all his faculties about him.  He was minute in his details.  He recollected that *during* 1837, he was the overseer of Nevels, and during no other year; and twice he repeats, the slave, Tom, escaped *"in the latter part of that year."* This statement is clear and explicit.  Standing by itself, it contains nothing upon which to found a suspicion of its falsity.  Its falsity is only determined by the other witnesses in this cause, who overwhelm Mr. McLean upon this point.  Does the Court of Appeals mean to say, that McLean did not mean that the boy escaped in the latter part of the year 1837?  The man himself has stated it so on two occasions, and has never given any reason to induce the supposition, that he did not mean to say so.  How does the Court then arrive at the conclusion, that he did not mean to assert it?

The assertion is false—that much is admitted, proved beyond doubt, for Turner, the Marshal of Louisville, states, that he committed this boy to the work house in Louisville on the 7th day of June, 1837.  Thomas Carroll says he saw him here in the fall of 1836.  Hudson and others saw him in the summer of 1837, at Louisville, so that on this point McLean is convicted beyond doubt.  The Court says this statement, as to the time, should be attributed *to mistake,* and should not invalidate his testimony.  Now, with due respect to the Court, we assert that it is the Court who invalidates his testimony.  They assume he is mistaken in order to preserve the structure which otherwise cannot be raised upon his testimony.  If Tom, the property of Nevels, escaped from his plantation in Louisiana in the latter part of the year 1837, it

PARKS
*vs*
RICHARDSON *et al*

is perfectly clear that this negro, who was in Louisville and in the work house on 7th June, 1837, was here through the summer of 1837, and was seen here, according to one witness, in the fall of 1836, cannot be the same negro. The only witness who pretends to identify him as the property of Nevels, details this circumstance of his escape and the time thereof, to show that he knows him and is able to identify him; yet, when he fixes that time, we show he is not speaking the truth, and when he comes in his presence to identify, conscience makes a coward of him, and he stammers out "an awkward expression" of what the negro says, and for himself speaks no farther. Is this such proof, may it please the Court, as should decide men's rights in this Common-wealth? The Court says it is clear this boy was a runa-way—admitted; that he was placed in the work house as such and escaped, and was found in the possession of Parks, and he has failed to show that he has any title to him—admitted; yet, that he *belonged to Nevels, or is* subject to his debts, is, from all this, clearly a *non se-quitur.* How is it to be then determined? McLean alone is the witness. He does not identify the boy; the only circumstance he details is *a mistake,* in the opinion of the Court. We respectfully submit, if it is not more proper to suppose, that McLean *is not mistaken in the date* at which he fixes the escape of Nevels' property, and *that this cannot, therefore, be the same slave?* Is not this the most proper when the contrary conclusion distorts the evidence; breaks its harmony; gives force to one part; apologises for another, and finally concludes without any testimony in the cause to support the conclusion? Why does the Court suppose McLean to be mistaken? On what proof? Who is the witness? Where is the circum-stance in the record? It is necessary to invalidate his testimony to reach the conclusion, and, if invalidated, where is the testimony on which to fix the time that the slave of Nevels escaped, or that he escaped at all? We confess ourselves at a loss to find it after most diligent search. Suppose however he *is mistaken* in the date of the escape. Was it prior to 7th June, 1837? Was it prior to the fall of 1836? McLean was not then the

overseer of Nevels, yet Thomas Carroll says then the negro was here.   Listen to his statement: to Richardson's 4th interrogatory he answers, "Deponent first saw the negro at his work shop in the fall of 1836."    It must be that Carroll is also *mistaken*, or McLean has never seen this negro in Nevels' possession!   But if McLean is *mis-taken* in one particular, may he not be *mistaken* in every particular?   The rule of evidence, "*falsum in uno, fal-sum in omnibus*," it would seem should apply to the testimony of this man with peculiar force.   The combination here to mulct Parks is palpable, and, therefore, we think this evidence deserves to be canvassed with the closest scrutiny.   With all respect for the Court, we are at a loss how to account for the opinion delivered, without excluding McLean's testimony in essential parts, and if excluded, we are then at a loss to perceive upon what this judicial decree will rest.   We ask on that account also for a re-hearing.

The Court says, "if the bill of sale be genuine, Parks has not attempted to show that Mrs. Wilkinson and her son had any title to the slave, nor that there *was* any such *persons* in being," &c.    "The bare omission to do so (to prove the existence of Mrs. Wilkinson) strongly demonstrates, that the pretended bill of sale produced, was a contrivance concocted by Parks, probably in concert with Carroll, to cover over the fraud and to screen Parks from responsibility."

With due deference to the opinion of the Court, the counsel who managed this cause in the Court below, for Mr. Parks, insists that there was no reason to prove any thing about the bill of sale, because, if Parks had not in fact sold to Richardson, it made no difference, so far as Richardson's rights were concerned, whether Parks had any title at all; and Parks not being a warrantor of Richardson, or having any privity of contract with him, was not bound to make good his title on Richardson's demand of the showing of it.   This view of the cause, though the principal defence relied upon in this cause, the Court seems entirely to have overlooked, as it is not alluded to even in the opinion, though the mass of the evidence bears upon it.

No witness had proved Richardson's bill of sale until Chenowith himself was introduced. We contended, upon the authority of the case of —— ——, that he was not a competent witness, but if he were, then we had shown enough to discredit him, and to prove, beyond all doubt, that this negro, at the time of the sale to Richardson, was in fact the property of Chenowith himself.

Chenowith and Ronald are examined to prove Chenowith's agency. Chenowith says, as to the institution of his agency: "When Parks left the said negro at the jail, he requested deponent to sell him, in the presence of Ronald and some two or three others who came with Parks to the jail." Ronald refers to the same time for the institution of this agency, and Parks never has denied, that at this time he did authorize Chenowith to sell the boy. Parks alledges, however, that before the sale, the boy had been, by him, traded to Chenowith for a negro girl, and $150 "to boot," and afterwards the agency of Chenowith ceased. How does Chenowith explain this? He says that a Mr. Bull had deposited a girl, called Louisa, for sale at the jail on the 29th November, 1837, and on the 22d of December he sold Louisa to Parks, and Parks agreed to pay for Louisa out of the money for which Henry *should be sold*. Henry, (Richardson's boy,) was at that time in jail, lodged for sale. He says he sold Henry to Richardson about the 28th of December, 1837, and in one place he says he paid over to Parks all the money for which Henry sold except the jail fees, and that Parks told him to keep $150 with which to pay his note to Mrs. Wilkinson, which was afterwards paid over. In another place he admits he "fixed" this $150 with Parks in the trade for Harriet. Harriet was lodged for sale 8th January, 1838, and was after that date purchased 'by Parks. Such is Chenowith's version. He absolutely denies that he ever bought Henry. He had gone to Parks' house, and, as we insisted, had there traded the girl for Henry *alias* Tom. This, Chenowith denies, though he admits he was at Parks' house, but says "his object in going there was to see how much Parks would take for Louisa; there were persons present, but he did not know them. He told Parks a gentleman wanted to purchase

Louisa." Now in all this there is an air of extreme im-
probability: 1st, that he should dispose of Bull's prop-
erty upon the expectation of funds to be thereafter derived
from the sale of Henry. What prudent man, in a matter
in which he was only interested as a factor, would dis-
pose of property upon the contingency of realizing from
other property, *in future*, the funds to pay therefor?
Would he run the risk of escape, death, &c. 2d. Is it
probable he should have gone to Parks' residence to see
what he would take for Louisa whom he had only sold a
few days before to Parks, for a gentleman desirous to
buy her? Who was that gentleman, &c. &c. How does
he stand when his testimony is compared with that of
other witnesses?

Noah V. Thomas says: "Deponent recollects being at
Parks' house when Stephen R. Chenowith came to Parks'
house to trade with Parks for the boy, Henry, alluded to,
and Chenowith then and there agreed to give Parks $150
and the girl, Louisa, for the boy, Henry." He heard the
conversation between Parks and Chenowith, and the
terms of the trade were as stated above. Witness fur-
ther says he afterwards "saw Parks pay $200 on the
price of Harriet, and the $150 due to Parks by Cheno-
with on the trade between Louisa and Henry was set-off
on the balance due for Harriet.

William Bowles also testifies, that he was at Parks'
and heard the trade between Parks and Chenowith, and
the terms were, that Chenowith was to have Henry, (the
boy in question,) and to allow for him the girl, Louisa,
and $150, and the trade on those terms was ratified. He
further says he went with Parks, in February 1838, to
pay for Harriet, and Parks paid to Chenowith $200, "and
the balance, ($150,) was agreed between the parties to
operate as an off-set for the balance of $150 due from
Chenowith to Parks *on the trade between them for the boy,
Henry, and the girl, Louisa, as before stated.*" Parks
himself swears to the same facts in his answer, and he
had sworn to them in the same way in 1839 in answer
to Richardson's first bill. The same facts are elicited
from other witnesses by Richardson in the detail of Parks'
conversations, called for by the complainant. The credit

of these witnesses is unimpeached and unimpeachable. How then does the case stand? Chenowith is interested to sustain his pretended agency. He is interested in the event of the suit: 1st. Because he holds certain demands against Jones, which are to be paid out of the money collected by virtue of this decree, (see his deposition.) 2d. If Richardson succeeds, he is to pay him for keeping the boy in jail, *pendente lite*, otherwise he is not to be paid, (see his deposition;) and because, if he does not fix upon Parks this liability, he is personally liable to Richardson. He swears in the cause, thus situated, and denies the trade for Henry; and he is flatly contradicted by two unimpeached witnesses, who swear they were present and heared the trade whereby Louisa became Parks' property and Henry became the property of Chenowith—the date, 22d December, 1842, and Henry is sold to Richardson by Chenowith, pretending to act as Parks' agent, on the 28th December, 1842. Under these circumstances, has not Parks made out his allegations? Is the bill of sale to Richardson his deed? Was Chenowith rightly his agent? Had he the right to bind Parks? Is there any privity of contract between Parks and Richardson? Was Parks bound, in response to Richardson, to show the title under which he claimed?

In the opinion of the Court, no allusion whatever is made to this branch of the cause, or the defence we think it makes out. If it be said, as was said by Chancellor Bibb, that the agency having been once established should have been publicly revoked else the principal will continue to be bound, we reply, that the institution of the power was a verbal authority never announced by Parks to Richardson, and that Chenowith was not a general agent for Parks. When a special agent acts he is bound to show his authority, and the party who trades with him without knowing or seeing its existence, trades at his peril: (*Smith's Mercantile Law, title Principal and Agent.*) Here the authority was revoked by the acts of the parties, in the presence of witnesses, and Parks was not bound by law or custom to publish it, as he had not, by any publication, instituted it. It is new law to us, that if a man authorizes his neighbor, by parol, to sell

his horse, that he must, by publication, revoke the authority, or he is bound, even though that neighbor shall afterwards, by purchase or exchange, become proprietor of the animal!

But the bill of sale is established—that much is admitted by the opinion of the Court. The subscribing witness does not swear to it or prove his attestation, it is true; but that he did attest it is proved beyond cavil by four or five witnesses—some of whom are related to him nearly, others familiar with his signature, and others who heard him acknowledge it, and say he saw the money paid over to young Wilkinson by Parks in August, 1837. Now the Court say his title being impeached, Parks should have proved the existence of Mrs. Wilkinson and traced her title. There would be force in this if Parks were in a position to be called on by Richardson, but he has no privity with Richardson, and besides is not, as we take it, bound to trace his title beyond the limitation if he carries it back to a person in possession, claiming the slave, unless a paramount title is *clearly proved* and an eviction or breach of warranty has taken place. Parks is proved before you to be a man of industrious habits; a resident, punctual in the performance of his engagements, and responsible, though in moderate circumstances. Upon this proof, are the orders for attachment and *ne exeat* to stand and be enforced against him and his sureties, though they were not granted on sufficient allegations and are unsupported by a particle of proof?

We trust our views, here written, may suggest a re-consideration of this cause to the Court, because we really feel a perfect conviction that the case should be otherwise decided than it is, and believe, upon a re-hearing, we can convince the Court that we are correct in our opinions. We respectfully urge your honors to grant a re-hearing.

HUMPHREY MARSHALL *for Parks.*

## RESPONSE,

### By CHIEF JUSTICE EWING.

*October* 31.

THIS being a mere matter of fact case, involving no new principles of law, we deemed it unnecessary to say

PARKS
*vs*
RICHARDSON *et al*

This Court will interpret depositions taken by unskillful draftsmen according to the obvious intent of the writer, so as not to defeat the intent of the witness.

but little more in the opinion than to state our conclusions upon the facts exhibited in the record. Nor shall we now consume time in analyzing the facts, or in bandying arguments upon them, with the zealous and persevering counsel, whom we cannot hope to convince, he not being yet convinced that he may be mistaken, by the concurring decisions of the Chancellor and all the members of this Court against him.

We still believe that the testimony of McLean, by a fair allowable and charitable interpretation of its terms, sufficiently identifies the slave Tom, and looking at it as a whole, that it was so intended by the deponent, and would be so understood by the common mind. We should give to a deposition, (which is often taken in the absence of counsel and by ignorant and unskillful persons,) that interpretation which will give it effect according to the obvious intention of the deponent, and should not indulge in a grammatical or technical criticism of its language or terms. To do so would often pervert its meaning and the manifest intention of the witness.

McLean, the witness in this case, stated in answer to interrogatories propounded to him, that he had been the overseer of Nevels during the year 1837, in Louisiana; that Nevels owned a slave by the name of Tom, who ran away from him in the latter part of said year, and he had never recovered him. He was then asked the following question: "Have you or not, ever seen the *said slave, Tom,* since he ranaway from said Nevels, and if you have, *where* was he, and did *he* know you before you spoke to him? And answered as follows: "He *has seen the slave, Tom,* since he ranaway; that within the last week the deponent, with some others, went into the jail in this City to *see said slave;* that on going in, *the slave, Tom,* recognized the deponent as being his old overseer, and called him by name, without the deponent's speaking to him at all, he was, however, asked the question by the deputy Jailor, if he knew deponent, without mentioning deponent's name, and his reply was, that the deponent was his old overseer, calling him by name at the same time." Now the unsophisticated and common mind would at once embrace the conclusion, from what the witness states, that

the slave, Tom, that ranaway from Nevels, in Louisiana, was *the same Tom* whom the witness saw in jail within the last week, and who knew him as his old overseer, and called him by name. He has *seen the slave, Tom*, since he ranaway. What slave? The slave, Tom, that belonged to and ranaway from Nevels. Where did he see him? In jail, and he at once recognized him and called him by name. When? Last week when he went to the jail with others. And can it be true that he has seen *the* Tom in jail that was owned by and ranaway from Nevels, and that *the* Tom in jail is not the slave, Tom, of Nevels? We think not, and that the witness intended to express no other idea than that the slave in jail was the identical same slave that belonged to and ranaway from Nevels. And if he is not, he is as much liable to a prosecution for perjury, as if he had sworn directly and in unequivocal language to the fact. He is corroborated in his statement by the deputy Jailor and another, who was present at the first interview between him and the slave, and who testify to the facts stated by him, of the slave's immediate recognition of him, and calling him by his name, under circumstances and with emotions that impress verity upon the statement of McLean. Jones, the complainant, swears to his bill, and in it states, that he knows the slave to be the slave of Nevels, and that he, with two others, ranaway from him; and gives a detailed account of the slave, and of his knowledge of him, that carries with it the impress of truth. Added to all this is the evidence that the slave, Tom, under the name of Henry, was taken from a steam boat and put into the work house in Louisville as a runaway, in June, 1837, and after he escaped, he was found in the possession of Parks. In the absence of all proof casting the slightest suspicion on the character of Jones or his witnesses, we cannot impute to them all corrupt combination and perjury, which crimes Jones and his witness. McLean, are certainly guilty of, and Winder and Kinney perhaps also, if the slave, Tom, in question be not the slave of Nevels. Besides, if he be not the slave of Nevels, no one knows to whom he belongs. Parks has certainly made out no pretence of title to him. We would rather ascribe to mistake than to

perjury, the statement of the witness as to the time the slave escaped, and the more especially when we know that the precise *time* when a particular occurrence transpired, is more difficult to retain and call up in the human recollection than almost any other fact.   And in the case before us, the witness was not called to the designation of the *precise time* when the slave escaped.

That which the counsel terms the main branch of his defence, did not escape the careful scrutiny of this Court. We were convinced then, and are still satisfied that it has no merits in it.   That Parks authorized Chenowith to sell the slave, Tom, and that he put him in his custody in jail for that purpose is clearly proven.   Chenowith did sell him to Richardson, and executed to him a bill of sale, in the name of Parks, by himself as his attorney, also appears.   Parks attempts to escape from liability by denying the authority of Chenowith to sell, and adduces two witnesses, by whom he proves that Chenowith had exchanged a negro girl, by the name of Louisa, to Parks for Tom, and was to give $150 to boot.   This girl was not the property of Chenowith, but belonged to a man by the name of Bull, who had put her also in the custody of Chenowith to sell.   Chenowith, no doubt, was allowed compensation or a per cent. for selling, and was anxious to make any arrangement by which he might make his reward; and as Parks wanted a negro girl, his interest might, and no doubt did prompt him, to let Parks have the girl, and wait a few days for pay, until he could sell the slave, Tom, and receive the price agreed to be given for Louisa out of the proceeds of his sale, and thus make his percent on the sale of both slaves ; and he would be safe in doing this, as Tom was much more valuable than the girl, and would likely be more readily sold. Parks' witnesses knowing nothing of the previous authority of Parks to Chenowith to sell the boy, or of the prior arrangement between them in relation to him, might, by witnessing the chaffering between them, with respect to Louisa and the boy, and the difference agreed on as to their value, readily fall into the mistake, that they had exchanged the one for the other, when the parties had no such intention.   That they had no such intention is evi-

denced by the fact, that Parks made no bill of sale to Chenowith, and never has yet executed any bill of sale for the boy, if the one executed to Richardson was executed without authority, though in the sale of slaves it is believed to be the general custom to execute a bill of sale. Besides, no revocation in fact, of the power given to Chenowith, is proven or attempted to be proven. The revocation, if any ever took place, is implied only, from the proof of an exchange. Nor does it appear that Richardson was ever apprised of this implied revocation, nor that Chenowith regarded his authority to sell in the name of Parks, as revoked. He swears to the authority and says it never was revoked, and he never traded for the boy, and he is sustained in the fact, that authority was given, by another witness. The testimony of Chenowith was not objected to in the Court below, and we must take it here for what it is worth. As he must have understood the facts better than any other, save Parks, if his evidence is to be believed, there can be no question as to the true character of the transaction between him and Parks. If the interpretation be given to the transaction and to the evidence, which we have given to it, then is the apparent confliction in the evidence reconciled, and it may be made all to stand together. But if there be doubt upon the evidence on this branch of the case, we would not feel disposed to disturb the decree of the Chancellor, for the following reasons: Parks is responsible for the slave to Chenowith or to Richardson. If he sold to Chenowith and Chenowith to Richardson, and Chenowith was before the Court, the Chancellor might have decreed at once that Parks should pay to Richardson, and Parks would have had no just ground to complain. So that the objection, at best, is a technical one, and can have no other effect than to defeat the recovery, not upon the ground of exemption from obvious liability, but upon the ground that he is decreed to pay to Richardson instead of being decreed to pay to Chenowith. Without consuming time to extend the remarks upon mere matters of fact further, we are satisfied that the Chancellor's decree is right, and that it would avail nothing to indulge the counsel with a re-argument. The petition is, therefore, overruled.